SECOND DIVISION

SEPTEMBER 15, 1998

THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM THE

) CIRCUIT COURT OF

Plaintiff-Appellee, ) COOK COUNTY

)

v. ) No. 95--CR--12124

)

DWAYNE BRUCE, ) THE HONORABLE

) VINCENT GAUGHAN,

Defendant-Appellant. ) JUDGE PRESIDING

JUSTICE COUSINS delivered the opinion of the court:

 Following a jury trial, defendant Dwayne Bruce was convicted of first degree murder and armed robbery.  He was sentenced to an extended term of 100 years for murder and 6 years consecutively for armed robbery.  He now appeals both the conviction and the sentence.  Defendant contends that his conviction must be reversed because the trial court erred and violated his constitutional right to a fair trial by: (1) admitting hearsay testimony when detectives testified that members of the victim's family identified jewelry that the defendant was wearing at the time of his arrest as the victim's, and (2) admitting into evidence a handgun seized from a car that he was driving.  The defendant also contends that the trial court abused its discretion in imposing the maximum allowable extended term of 100 years' incarceration for the murder conviction. 

BACKGROUND

Robyn Cherry testified that in the evening of May 11, 1993, she went to a party in the Ida B. Wells housing project with her boyfriend, Dwayne Taylor.  At that party, they met up with the defendant and some other individuals, whose names were Kenny, Courtney Donelson, Troy, and Robert Seals.  

Mr. Taylor suggested that they stick someone up.  The group agreed to do so and left in Mr. Taylor's station wagon in order to find someone to rob.  They went south on the Dan Ryan Expressway and exited at 111th Street.  

At first the group's attention was drawn to a white Lexus.  Because the car was a Lexus and had expensive accessories, they assumed that its driver was wealthy. After following this car for several blocks, however, they lost it.

Shortly before 9 p.m. they saw another vehicle, a black Nissan Pathfinder.  The driver was Tedrin West, who was on the way to a friend's house to watch a Bulls game.  His father had given him the Pathfinder for his twenty-first birthday.  Mr. West had with him some jewelry, a beeper and a cellular phone.  Dwayne Taylor said "We got us a vic," meaning a robbery victim.  

The group followed Mr. West to a currency exchange.  While Mr. West was inside wiring some money, Mr. Taylor hid behind the car with a gun in his hand.  When Mr. West got back in the Pathfinder, Mr. Taylor put the gun to the window.  He ordered Mr. West to take the keys out of the ignition and open the door.  Mr. West complied and then Mr. Taylor, the defendant, and Robert Seals got in the Pathfinder with Mr. West and drove off.  Their companions followed in the station wagon.

The Pathfinder went to three different houses.  At each, Dwayne Taylor called out to his associates in the station wagon that Mr. West was "playing games."  Then they drove to a deserted street.  Mr. Taylor and the defendant, each armed, exited the Pathfinder with the victim.  The defendant ordered the victim to lie down on the ground and then shot him in the back of the head.

Mr. Taylor showed the others jewelry taken from Mr. West. Ms. Cherry testified that among these items was a chain which she described as a "flip-flop."  The defendant had a gold ring with a diamond-encrusted six-point star.  According to Ms. Cherry, he displayed this ring as proceeds of the robbery.

Then the group drove back toward the Dan Ryan Expressway.  They were driving in a "crazy" manner and ran a stop sign.  At this point two police officers tried to stop the Pathfinder.  They pulled the Pathfinder over twice, and twice it sped away after the officers exited their vehicle.  Then the police found the Pathfinder abandoned on the side of the expressway, with the door open and the motor running.  They impounded the Pathfinder and then notified Thomas West, Tedrin West's father, since the title was in his name.

After picking up the Pathfinder, Thomas West called his ex-

wife, Tedrin's mother, to let her know that the Pathfinder had been found abandoned.  Ms. West, extremely worried, called the police.  She tried to reach Tedrin on his beeper and cellular phone, but received no answer.  Finally a man answered on the cellular phone.  She did not recognize his voice and asked where Tedrin was.  The man said "He's gone."  "Gone where?  Where is Tedrin?" she asked.  "He's gone, bitch," the man replied and then hung up.

When the police arrived, Ms. West gave them a photograph of her son.  Within an hour they found his body.

Later, the police went over records for  Tedrin's cellular phone.  Subsequent to the murder, calls had been made to two women, each a mother of a child of the defendant.

A few weeks later, police officers pulled over the defendant when he ran a red light.  They arrested him and recovered a .38-

caliber revolver from the car. This gun was of the same general type as that used to kill Mr. West.

Meanwhile, Mr. Taylor had sent Ms. Cherry to stay with his sister in Iowa, because he was afraid that she might turn him in. About a year later Ms. Cherry returned to Chicago, and, as Mr. Taylor had feared, she went to the police.

In exchange for a reduction in charges against her, she agreed to testify about this murder and about an unrelated home invasion and murder.  She was questioned by Detectives Michael McDermott and James Boylan.  Ms. Cherry related to them the events surrounding the murder and told them that the defendant was the one who had fired the shot.  Although she did not know the defendant's real name at that time, she was able to give a physical description and an address.

The police were not able to find the defendant at that address, but in a few months they located him and arrested him.  The defendant had in his possession a ring with a diamond encrusted six-point star and a "flip flop" chain.  When questioned about these items, the defendant said that he had bought them, but he did not remember where.

At the request of the detectives, members of Mr. West's family came to look at the jewelry.  In response to a question on direct examination, Detective Boylan told the jury that "family members" identified the ring as Tedrin's. When the detectives confronted the defendant with this identification, he told them the names of stores where he said he had bought the ring and chain.  They released the defendant at that time, but re-arrested him sometime afterwards upon finding out that a gun having the class characteristics of the murder weapon had been found on the defendant after he ran the red light.

The defendant was charged, tried and found guilty of armed robbery and first degree murder.  He was eligible for the death penalty.  At the sentencing hearing, the judge learned of other crimes committed by the defendant, including a conviction as a juvenile for attempted murder.  In mitigation the defense stressed that, as the defendant was still relatively young, he had rehabilitative potential.  Also, the defense pointed out that the defendant had shown remorse in expressing his condolences to the victim's family.  The court sentenced the defendant to 100 years for the first degree murder count and 6 years, to be served consecutively, for the armed robbery count.

The defendant appeals the conviction and sentence on three grounds.  First, he contends that the .38-caliber revolver should not have been allowed into evidence because there was insufficient evidence to link it to the crime.  Next he argues that the testimony of the detectives regarding the identification of the jewelry by "family members" was inadmissible hearsay and that it was reversible error for the court to admit it.  Finally, the defendant maintains that the trial court abused its discretion in imposing the maximum extended-term prison sentence for first degree murder allowable under law.

We affirm.

ANALYSIS

The defendant maintains that the gun was inadmissible because it was irrelevant. We disagree.

As long as the gun could have been the murder weapon, it was competent evidence.  If a person accused of a crime possesses a weapon suitable for the commission of that offense when arrested, the weapon is admissible even if it cannot be shown that it was the weapon actually used.  
People v. Magby
, 37 Ill. 2d 197, 202 (1967).

There is an indication in Detective Boylan's notes that Ms. Cherry said the gun used to commit the murder had a brown handle.  The gun that was found with the defendant had a black handle. Although the .38 revolver was of the same type as that used to kill Mr. West, the defense points out that there are millions of guns of this type in the United States.

Defendant argues that since the murder weapon had a brown handle, the black .38 could not have been the gun used.  Thus, he concludes, it is irrelevant, even if one takes 
Magby
 into account. 

But there was also evidence that the murder weapon had a black handle.  Ms. Cherry so testified in court.  The matter was properly left before the jury under the doctrine of conditional relevance.

Conditional relevance is treated as follows:  If the relevance of a piece of evidence depends on the truth of some other fact, the piece of evidence is admissible if there is sufficient evidence to support a finding by a reasonable juror that the factual condition has been fulfilled.  
Marvel Engineering Co. v. Commercial Union Insurance Co.
, 118 Ill. App. 3d 844, 848, 455 N.E.2d 545, 548 (1983); see also 
1 J. Strong, McCormick
 
on
 
Evidence §53, at 215-16 (4th ed. 1992).

In this case, the relevance of the offered gun depended upon whether the handle of the murder weapon was black.  There was sufficient evidence to support a finding by a reasonable juror that the handle was black.  So the gun was properly admitted.

The defense also maintains that even if the gun was relevant, any relevance was outweighed by unfair prejudice and surprise.  Specifically, the defense asserts that presenting the gun to the jury likely encouraged it to place a much greater weight on the gun as evidence than was warranted, given  the length of time between the crime and the identification of the weapon.  Whether relevant evidence is to be excluded as unfairly prejudicial is a matter in the sound discretion of the trial court.  
People v. Chambers
, 179 Ill. App. 3d 565, 577, 534 N.E.2d 554, 560 (1989), citing 
People v. Ward
, 101 Ill. 2d 443, 455-56 (1984).  We do not have a basis in the record to find an abuse of discretion.

Defendant next argues that the trial court erred by allowing Detective Boylan to answer a question as to whether "family members" identified the jewelry.  The defense made timely objection to the question as calling for hearsay.  The trial court overruled the objection, and the witness answered the question in the affirmative.  

Later, on cross-examination of Detective Boylan by the defense counsel, the following were the pertinent questions and answers:

"Q. And you then asked him more questions about the 

jewelry, is that correct?

A. I informed him that he had been -- that it had been 

identified.

Q. By whom?

A. By Tedrin West's brother.

Q. Okay. Do you know his name?

A. I believe it was Kelly."

Whether the ring with the star belonged to the victim or to the defendant was a point of much contention in the trial.  The jury heard Detective Boylan testify that family members at the police station had identified the ring as belonging to Tedrin.  

The defense argued at trial that the ring had belonged to the defendant all along.  The six-point star on the front is a symbol used by the defendant's gang, the Gangster Disciples.  Also, the ring had a "G" engraved in it, probably standing for "Gangster," as Detective Boylan conceded.  Tedrin West was not in a gang.

In defending admission of the statement, the State argues that when "the declarant is available in court or there is an opportunity to ascertain the veracity of the testimony by cross-

examination, there is no hearsay problem."  While some of the members of Mr. West's family were in court, Kelly West, the person who actually made the identification, was not available for cross-examination.

The prosecution further contends that the statement was not hearsay because it was elicited not for its truth but, rather, to explain investigative procedure.  The State argues that the identification by family members explained why the detectives went back to ask the defendant a second time where he had obtained the jewelry.

Relative to the prosecution's contention, a police officer may, in order to clarify the progress of an investigation, testify that he or she has had a conversation with a third party.  The officer may not, however, testify as to the substance of that conversation, unless it would otherwise be admissible
, or (1) is necessary to explain police procedure, and (2)the content of the conversation does not go to "the very essence of the dispute."  
People v. Jones
, 153 Ill. 2d 155, 160 (1992); 
People v. Singletary
, 273 Ill. App. 3d 1076, 1084, 652 N.E.2d 1333, 1338 (1995).  Here, whether the ring belonged to the victim or to the defendant obviously goes to the essence of the charge of armed robbery.  

Furthermore, in our view, Detective Boylan's testimony went beyond what was necessary to explain police procedure. In 
People v. Gacho
,
 122 Ill. 2d 221 (1988), the supreme court said that it was permissible for a police officer to testify that he had a conversation with the victim and then set out in search of the defendant, even if this would raise the inference that the victim had implicated the defendant.  The court cautioned, however, that had "the substance of the conversation *** been testified to, it would have been objectionable as hearsay." 122 Ill. 2d at 248.

Under 
Gacho
, it would have been permissible for Detective Boylan to testify that he talked with the victim's family and then went to ask the defendant about the jewelry again.  The jurors could have drawn their own conclusions.  However, in the instant case we hold that the purported identification was hearsay, and it was error to admit it.  

Although the admission of Detective Boylan's testimony regarding the substance of the conversation with family members was error, we further hold that the error was harmless for the following reasons:  First, the record establishes that the trial judge recognized the mistake later in the trial and took steps to correct it.  In response to a motion 
in limine
 by the defense, he admonished the prosecution not to mention the hearsay statement in closing argument.  Also, at the beginning of instructions to the jury, he gave the following special instruction:

"First, I want to give you a special instruction, and 

that's concerning the testimony of Detective Boylan.

On the date that Mr. Bruce was arrested, on December 

21, 1994, Detective Boylan testified that the brother of 

Tedrin West, Kelly West, identified the jewelry.  All right.   That is a hearsay statement and that is not evidence."

Moreover, there was other testimony linking the ring to the victim.  The victim's mother testified that the ring belonged to her son.  The defense could, and did, cross-examine her on that point, bringing out its theory that the ring belonged to the defendant since he and not the victim was a member of the Gangster Disciples.  In addition, Ms. Cherry testified that the defendant showed her the ring as proceeds of the robbery.  Under these circumstances, the error by the trial judge was harmless.

Relative to the sentence, after listening to arguments of the attorneys, the trial judge stated that he was imposing an extended-term sentence of 100 years' incarceration pursuant to section 5-5-3.2(b)(1) of the Unified Code of Correction (730 ILCS 5-5-3.2(b)(1) (West 1994)).  Given the defendant's criminal record, including an attempted murder conviction as a juvenile, we cannot say that the trial judge abused his discretion.  This court has noted that there is "a strong [legal] presumption that a trial court's sentencing decision is based upon proper legal reasoning, and the court will be presumed to have considered any evidence of mitigation which is before it." 
People v. Partin
, 156 Ill. App. 3d 365, 373, 509 N.E.2d 662, 667 (1987).

For the foregoing reasons, the decision of the trial court is affirmed.

Affirmed.

GORDON, P.J., and McNULTY, J., concur.